RANDY S. GROSSMAN
United States Attorney
MELANIE K. PIERSON
Assistant U.S. Attorney
California Bar No. 112520
Office of the U.S. Attorney
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-7976
Email: Melanie.Pierson@usdoj.gov

Attorneys for the United States

## UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>v.<br><br>ZIFENG WU,<br>      Defendant. | Case No. 23cr887-AJB<br><br>**GOVERNMENT'S RESPONSE AND OPPOSITION TO DEFENDANT'S MOTIONS:**<br>  **1. TO COMPEL DISCOVERY**<br>  **2. TO FILE FURTHER MOTIONS**<br><br>DATE: August 14, 2023<br>TIME: 2:00 p.m. |

COMES NOW the plaintiff, United States of America, by and through its counsel, United States Attorney Randy S. Grossman, Assistant U.S. Attorney Melanie K. Pierson, and hereby files its Response and Opposition to Defendant's Motions to Compel Discovery and to File Further Motions. Said response is based on the files and records of the case.

DATED: June 12, 2023          Respectfully submitted,

                                 RANDY S. GROSSMAN
                                 United States Attorney

                                 /s/Melanie K. Pierson
                                 Assistant U.S. Attorney

I.
STATEMENT OF THE CASE

On May 16, 2023, a federal grand jury in the Southern District of California returned a nine-count indictment, charging the defendant

with Conspiracy, in violation of Title 18, United States Code, Section 371, and eight substantive counts of the Sale/Purchase of Goods Imported Contrary to Law, in violation of Title 18, United States Code, Section 545, as well as Criminal Forfeiture. On May 10, 2023, the defendant was arrested pursuant to a warrant based on the indictment. The defendant entered a plea of not guilty to the indictment at his arraignment on May 11, 2023, and a hearing on all motions was set for June 12, 2023.

On June 6, 2023, the defendant filed motions to Compel Discovery and to File Further Motions. The United States responds to those motions herein. That same day, both parties filed status reports regarding discovery, and a joint motion to continue the motion hearing date. On June 7, 2023, the court issued an order continuing the date for the motion hearing until August 14, 2023.

II.

STATEMENT OF FACTS

In January of 2021, a Chinese HSI undercover agent (UC) began communicating with defendant Wu, representing an interest in buying t*otoaba*, shark fins and other seafood products. On February 3, 2021, via telechat, the UC observe Wu pull out a totoaba bladder and display it in his vehicle. The HSI undercover agent, via telechat, agreed to purchase the *totoaba* and provide payment by wire transfer after viewing the bladders. The UC advised Wu that a Mexican male employed by the UC would take possession of the *totoaba* once payment was made. This conversation was recorded and agents took photos and video of Wu in the parking lot.

During the conversation in the car, Wu explained to the UC that the fish was rare, came from Mexico, and that he needed to know in advance of the intent to purchase so he could hold the product. Wu told the UC that the fish was caught in southeastern Mexico and transported to Tijuana irregularly. Wu told the UC that payment could be wired to his US bank account or sent to China via WeChat. The UC asked for the name to send payment and was told "Feng Gabriel Wu." Wu complained about the COVID restrictions on travel but stated that he still had people to transport the product to the US for him, noting that he still had his factory in Mexico, with sea cucumber, seahorses, and other legal fish bladders. On February 8, 2021, Fish and Wildlife Service (FWS) agents wired $3600[1] to the account of Zifeng Wu at Chase Bank, as instructed by Wu.

On February 11, 2021, defendant Wu delivered three *Totoaba* swim bladders to a Cooperating Individual (CI), who was supposedly acting on behalf of the UC. The CI called the UC while meeting with Wu, to confirm the pickup. During the call, the UC agent told Wu that the UC wanted to buy seahorses. Wu said he only had a small amount of seahorses in inventory at the time, perhaps two kilograms.

On February 26, 2021, FWS agents wired $2850 to Wu's account where the previous wire had been sent. That same day, agents watched as Wu removed a large white plastic bag from his residence and drove to the Vons supermarket plaza to meet with the CI. The CI received a white plastic bag from Wu, which contained two smaller plastic bags containing

---

[1] The low price was due to the fact the bladders were very small and of poor quality.

5 lbs. (2.3 kg) of seahorses and 2 lbs. (1 kg) of shark fins. During the recorded exchange, Wu verbally confirmed that he delivered five pounds of seahorses and some shark fins, and told the CI to drive north with them on I-15 instead of I-15 to avoid being stopped at the checkpoint.

On March 24, 2021, FWS agents obtained a cashier's check in the amount of $48,000, made payable to Zifeng Wu. On March 25, 2021, agents watched as Wu removed a large cardboard box from his residence, place it in the rear of his vehicle, and drive to the Vons parking lot where he met with the CI. The CI delivered the cashier's check to Wu, and Wu provided the cardboard box, which contained 10 *Totoaba* swim bladders, to the CI. In the recorded conversation, Wu acknowledged that they could have problems because *Totoaba* was an endangered animal. Wu further discussed the status of sea cucumbers in Mexico, noting that not all were protected but that the protected ones "without paperwork" needed "to cross in other ways," but that once they were in the U.S. "we don't need to prove how it got here." Wu stated that the Mexican government gave permits for small amounts but that the fishermen caught more. Wu told the CI that he had been moving seafood for eight years, and his primary product was a special sea cucumber known as "fuscus." Wu stated that he used to receive a ton of wet fuscus sea cucumber a week during the season, which was from September to March. Now he wasn't getting any, and "it seems like the sea is running out." Wu said he sold most of the sea cucumber in the Los Angeles area. Wu said that due to the lack of product, he had only one worker at that time to cross the product, after they broke it down three kilos of sea cucumber into 20-

30 bags, but that if there was more product to cross he could ramp up with more people. Wu said he paid his driver $100/kg to cross *totoaba*. He explained that the driver had crossed daily for ten years in his van with tools for his roofing job and was never inspected.

On June 28, 2021, the CI telephoned Wu, who said he had no product to offer. The CI told Wu that he had sea cucumber in Tijuana, *fuscus* and Vallenato, and asked if Wu wanted to buy some. Wu said he would buy all he had if it were good quality. The CI agreed to bring the sea cucumber from Tijuana to San Diego. They agreed to meet in Chula Vista at a warehouse that Wu said he was renting.

On June 30, 2021, Wu met with the CI at a self-storage location in Chula Vista. Wu took the CI to a unit in the rear, where they unloaded the boxes of sea cucumbers (previously seized at the border by FWS in closed cases). Wu then asked the CI to remain while he drove back to his residence for a scale and cash. On the recording, Wu separated the sea cucumber by size and species, weighed it, and offered $20,340 cash for all of it, which the CI accepted. Wu told the CI that his whole business was seafood, and said he was looking for a way to send $500,000 safely to China. Wu stated that he was employing three drivers, and he paid $50/kg for them to bring seahorses into the United States and $100/kg for *totoaba* (which he called "tortilla"). Wu also stated that in 2016 or 2017, one of his drivers was caught at the border with 3 kgs of seahorses and fined $9,000[2].

---

[2] On June 27, 2016, Hector Canela was stopped at the border with his truck of tools, and 71 lbs of sea cucumber (Isostichopus fuscus) were discovered. Canela pled guilty to smuggling and was ordered to pay $9,000 restitution in 16cr2524-DMS.

On November 10, 2021, agents observed the CI meet with Wu at the self-storage location. The CI offered 31 dried Totoaba swim bladders to Wu that had been previously seized by the government. Wu examined the bladders, then traveled to his residence and returned with $40,000 cash and paid the CI for the bladders.

On December 6, 2021, Wu left a voicemail message for the CI, indicating that he wanted to purchase a Hawksbill sea turtle shell, and asking if the CI could find one for him. On December 9, 2021, the CI returned the call, and told Wu that a shell had been located for him, and it would be in San Diego in a few days. Wu urged the CI to be careful because it was an endangered species, which was very illegal.On December 16, 2021, agents watched as the CI delivered a Hawksbill sea turtle shell to Wu in a parking lot in Chula Vista, in exchange for $400. During the recorded transaction, Wu indicated that he intended to use the shell to make jewelry and frames for glasses.

On April 28, 2022, agents observed the CI meet with Wu in a parking lot in Chula Vista. The CI transferred eight cardboard boxes to Wu, who placed them in the trunk of his car. The boxes contained 2 Totoaba swim bladders, 1.5 kg of seahorses, and 40 kg of sea cucumber. Wu travelled to his residence, and carried the boxes inside. Wu telephoned the CI and stated that he would offer $11,532 for the product, to which the CI ultimately agreed. Wu returned to the parking lot and gave the CI $11,532 in cash.

On March 29, 2023, agents observed Wu leave his residence and meet with the UC in a parking lot in Chula Vista. After a brief recorded

discussion, Wu and the UC walked back to Wu's vehicle, a silver/gray Lexus. Wu gave the UC two *Totoaba* swim bladders and the UC provided $10,300 cash as payment. Agents observed Wu return to his residence after the exchange was completed.

Wu was arrested in a parking lot in Chula Vista on May 10, 2023, where he arrived intending to sell 11 Totoaba swim bladders to the UC. A search of his vehicle revealed the 11 Totoaba swim bladders. That same day, agents executed a search warrant at Wu's residence. At the residence, they located over $600,000 in cash and over $400,000 in protected wildlife (Totoaba, sea cucumbers, sea horses, shark fin and the Hawksbill sea turtle shell sold to Wu earlier).

III

STATUS OF DISCOVERY

The United States incorporates herein its report on the status of discovery, filed on June 6, 2023. That status report, written while government counsel was engaged in a trial, set forth the discovery that had been provided to date but did not describe the discovery that still would need to be provided. The case involves at least 15 hours of recorded conversations, in either Spanish or Chinese languages. While the defense has been provided with translations and summaries of these conversations, certified transcripts will be necessary for trial. The United States is in the process of having certified transcripts prepared. However, given the length of the recordings and the dearth of certified Mandarin interpreters, it will be difficult, if not impossible, to meet the court's deadline for production no later than August 14, 2023.

Additionally, samples of the wildlife have been sent to the FWS forensic laboratory for DNA analysis. The primary forensic scientist in this small lab, who has handled these matters for the past 20 years, recently retired. It is estimated that it will take two months to obtain the final peer-reviewed reports of the analysis of the wildlife in this case. The United States will then need to provide appropriate expert notices to the defense, once the transcripts and reports of DNA analysis are complete, and the experts are identified. The parties are continuing to meet and confer to ensure that all appropriate discovery is produced in a timely manner.

IV.

POINTS AND AUTHORITIES

A. THE GOVERNMENT HAS AND WILL COMPLY WITH RULE 16 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE. ANY ADDITIONAL DISCOVERY DEMANDS OF THE DEFENDANT SHOULD BE DENIED.

The Government, to date, has provided 16.8 gigabytes of discovery consisting of approximately over 444 pdfs and videos. The discovery provided to date is in excess of that required by Rule 16 of the Federal Rules of Criminal Procedure. The Government will continue to comply with the rules concerning discovery. The defendant's specific requests are discussed below.

1. The Government Has Already Disclosed Information Subject to Disclosure under Rule 16(a)(1)(A) and (B) of the Federal Rules of Criminal Procedure.

The Government has already disclosed the written and recorded statements of the defendant, as well as the substance of any relevant oral statements made by defendant in response to questions by Government

agents. After her arrest, the defendant invoked her right to remain silent, so no post-arrest statements exist.

Although the defendant is not entitled to summaries of oral statements of the defendant made to persons not known by him to be Government agents, and the memorialization of any such statements in a written report does not make them discoverable as written statements of the defendant, *United States v. Hoffman*, 794 F.2d 1429, 1432, n.4 (9th Cir.1986), the United States has disclosed the audio and video of the defendant's statements to the CI and the UC.

2. <u>The Government Will Comply with Rule 16(a)(1)(D).</u>

The Government will provide the defendant with a record of any prior convictions. Once the witnesses the government intends to call in its case in chief are identified, records of any evidence of prior convictions for those individuals will be disclosed.

The Government is well aware of and will fully perform its duty under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963) and <u>United States v. Agurs</u>, 427 U.S. 97 (1976), to disclose exculpatory evidence within its possession that is material to the issue of guilt or punishment, as well as its duty under <u>Giglio v. United States</u>, 405 U.S. 150 (1972) to provide information on any benefits provided to Government witnesses in exchange for their testimony and impeachment material. The Government agrees to provide this information at least one week prior to trial, after all the trial witnesses have been identified.

//

//

### 3. The Government Will Comply with Rule 16(a)(1)(E).

The Government will permit the defendant to inspect and copy or photograph all books, papers, documents, photographs, tangible objects, buildings, or places, or portions thereof, which are within the possession, custody, or control of the Government, and which are material to the preparation of the defendant's defense or are intended for use by the Government as evidence-in-chief at trial or were obtained from or belong to the defendant, and agrees to preserve such evidence during the pendency of this proceeding.

The defendant is not entitled to all evidence known or believed to exist which is, or may be favorable to the accused, or which pertains to the credibility of the Government's case. As stated in <u>United States v. Gardner</u>, 611 F.2d 770 (9th Cir. 1980), it must be noted that:

> "[T]he prosecution does not have a constitutional duty to disclose every bit of information that might affect the jury's decision; it need only disclose information favorable to the defense that meets the appropriate standard of materiality." <u>Id.</u>, 611 F.2d at 774-775 (citations omitted).

<u>See also</u> <u>United States v. Sukumolachan</u>, 610 F.2d 685, 687 (9th Cir. 1980) (the Government not required to create exculpatory material that does not exist); <u>United States v. Flores</u>, 540 F.2d 432, 438 (9th Cir. 1976) (<u>Brady</u> does not create any pretrial discovery privileges not contained in the Federal Rules of Criminal Procedure). All physical evidence collected to date will be preserved.

### 4. The Government Will Comply with Rule 16(a)(1)(F)

The Government will provide the defendant with the results or

reports of physical or mental examinations, and of scientific tests or experiments, or copies thereof, which are within the possession of the Government that have been performed to date, and will continue to provide any further such reports that by the exercise of due diligence may become known to the attorney for the Government and are material to the preparation of the defense or are intended for use by the Government as evidence-in-chief at the trial.

Scientific testing is being performed on some of the wildlife involved in this case, and the results will be disclosed to the defense as soon as they are received by the government. Many of the wildlife items have already been analyzed, and those reports have been provided.

    5.    The Government Will Comply with Rule 16(a)(1)(G)

    Reports of the expert testing of the wildlife that will be prepared will be disclosed as soon as the report is received. The *curriculum vitae* of the expert witness (DNA forensic scientist) will be disclosed after that person's identity is known. Additionally, the recorded statements of the defendant in the process of being translated by a certified interpreter. When those transcripts are completed, the Government will make the appropriate expert disclosures about those individuals as well.

    6.    Jencks Material

Production of witness statements is governed by the Jencks Act, 18 U.S.C. § 3500, and need occur only after the witness testifies on direct examination.  United States v. Taylor, 802 F.2d 1108, 1118

(9th Cir. 1986); <u>United States v. Mills</u>, 641 F.2d 785, 790 (9th Cir.), <u>cert. denied</u>, 454 U.S. 902 (1981).  Indeed, even material believed to be exculpatory and therefore subject to disclosure under the <u>Brady</u> doctrine, if contained in a witness statement subject to the Jencks Act, need not be revealed until such time as the witness statement is disclosed under the Act.  See <u>United States v. Bernard</u>, 623 F.2d 551, 556 (9th Cir. 1979).

As a practical matter, the Government has disclosed the reports of the investigation, so advance <u>Jencks</u> material (with the exception of transcripts of grand jury testimony) has already been provided.

7. <u>Prior Similar Act Evidence</u>

Other illegal importations and sales of wildlife conducted by the defendant during the period of the conspiracy are considered to be uncharged overt acts.  It has long been held that overt acts not specifically named in the indictment are nonetheless admissible. <u>Houston v. United States</u>, 217 F. 852 (9th Cir. 1914).

In <u>United States v. Soliman</u>, 813 F. 2d 277, 279 (9th Cir.1987), the court held that a summary chart of 102 fraudulent insurance claims was admissible at the defendant's trial for three counts of mail fraud, in the face of a defense challenge that they were "other crimes" evidence under Rule 404(b) of the Federal Rules of Evidence. The court noted that "evidence should not be treated as 'other crimes' evidence when 'the evidence concerning the other act and the evidence concerning the crime charged are inextricably intertwined."  In <u>Soliman</u>, the other events were direct evidence of the scheme to defraud in the mail fraud counts.

In this case, the evidence of other importations and sales of wildlife, including *Totoaba*, is direct evidence of the conspiracy to illegally import this type of product. The evidence of the other transactions can be found in the written and recorded statements of the defendant, which have been disclosed. If the court determines that such statements are not inextricably intertwined with the offenses charged, the government hereby provides notice of its intent to introduce such statements as evidence of knowledge, intent and absence of mistake or accident, pursuant to Rule 404(b) of the Federal Rules of Evidence.

8.  Henthorn Material

The Government will conduct a review of the personnel files of the federal agents involved in the case, and any impeachment material falling within the purview of United States v. Henthorn, 931 F.2d 29 (9th Cir.1991) will be disclosed.

9.   Impeachment Information

The defendant has requested various categories of impeachment evidence, including bias or motive to lie, evidence of criminal investigation or convictions, and evidence affecting perception. The Government has disclosed the evidence currently in its possession that falls into this category. The Government will continue to disclose such evidence in compliance with its continuing obligations under Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972) no later than one week before trial, when the witnesses for trial have been identified.

//

## 10. Informants and Cooperating Witnesses

The defendant further seeks disclosure of the names, addresses criminal record and location of informants. The defense has been provided with reports of the statements of individuals who provided information about the offenses at issue, without naming those persons. In United States v. Gonzalo Beltran, 915 F.2d 487, 488-89 (9th Cir.1990), the Ninth Circuit specified three factors that the court should consider in deciding whether to order the Government to disclose the identity of an informant. Those factors are: (1) the degree of the informant's involvement in the criminal activity, 2) the relationship between the defendant's asserted defense and the likely testimony of the informant, and (3) the government's interest in non-disclosure. In this case, the informant is a tipster with no involvement in the offense. The Government's interest in non-disclosure stems from an interest in potentially using these individuals as a source for future investigations. One of the sources has expressed fears regarding personal safety, given that Wang claimed to have brought three bodyguards to the initial transaction. The burden is on the defense to show that there is a relationship between the expected testimony of the informant and the defense to be raised at trial. United States v. Johnson, 886 F.2d 1120, 1122 (9th Cir. 1989). The defense has made no assertion whatsoever that the informant's testimony is relevant to any defense that might be mounted. Accordingly, the United States objects to an order requiring the disclosure of the name and address of the informant at this time.

## 11. Evidence Relevant to Sentencing

The government has provided full discovery in this case of all

information in its possession relating to the calculation of the base offense level, any specific offense characteristics, the defendant's role and will shortly provide the defendant's criminal history. Absent a more specific request for information, the government believes it has fully complied with this request.

### 12. Witness Names and Addresses

There is no requirement in a non-capital case for the Government to supply the defense with a list of witnesses it expects to call at trial. <u>United States v. Thompson</u>, 493 F. 2d 305, 309 (9th Cir. 1974), <u>cert. denied</u>, 419 U.S. 835 (1974).

As a practical matter, the defendant has been provided with the agents' reports, which provide the names and often the addresses of the known witnesses to date, with the exception of the CI and UC.

## B. <u>FURTHER MOTIONS</u>

The Government has no objection to the filing of further motions, so long as those new motions are based on newly disclosed evidence, or the defendant provides an adequate explanation of why the motions could not be filed in a timely manner. The Government requests that the court not issue an order permitting the filing of all additional motions, but instead review each request for further motions on its own merit.

### IV.
### CONCLUSION

The United States respectfully requests that the court deny the motions to compel discovery and file further motions, to the extent they are opposed herein.